**TRISDALE, Admr.**

v.

**OHIO DEPARTMENT OF MENTAL HEALTH.**

Court of Claims of Ohio.

No. 97–02461.

Decided June 4, 1999.

6

*Charles D. Lowe* and *Jeffrey W. Snead,* for plaintiff.

*Betty D. Montgomery,* Attorney General, and *William C. Becker,* Assistant Attorney General, for defendant.

---

FRED J. SHOEMAKER, Judge.

In her complaint, plaintiff Betty Trisdale alleges that defendant was negligent in allowing plaintiff's decedent, Dawayne Colyer, to engage in physical activity under environmental conditions that were hazardous to his health. Defendant denies liability. A bifurcated trial was held on the sole issue of liability. The findings and conclusions herein are derived from the documents and pleadings in the case file, evidence at trial, and the respective presentations by counsel.

Colyer, who was thirty years old at the time of his death, suffered from a mental illness diagnosed as schizophrenia chronic undifferentiated. His illness necessitated hospitalization for extended periods of time from early adulthood. In November 1992, Colyer was hospitalized at the Dayton Mental Health Center ("DMHC"). Dr. Cipriano Mauricio was assigned as Colyer's attending physician. Dr. Mauricio placed Colyer on neuroleptic (antipsychotic) medications to control his schizophrenia. Specifically, he was given the neuroleptic medications Thorazine (chlorpromazine) and Prolixin (fluphenazine). Additionally, he was given Cogentin (benztropine), which was used to treat the side effects of the antipsychotic medications. Plaintiff asserts that Thorazine and Prolixin are known to inhibit the body's ability to cool itself in two ways: (1) neuroleptic medications

interfere with the body's thermo-regulatory system, and (2) they interfere with the body's ability to perspire. Plaintiff maintains that Cogentin also interferes with the body's ability to perspire. On June 22, 1993, Colyer was on the following doses: Thorazine—2,000 mg per day; Prolixin—30 mg per day; and Cogentin—2 mg per day.

On June 22, 1993, at approximately 5:30 p.m., Colyer requested permission to go outside and play basketball with a psychology assistant at DMHC, Kevin Wulff, and other patients. Elaine Irons, the Head Charge Nurse of DMHC Ward 56, reviewed Colyer's medical chart and gave him permission to go outside and play basketball. However, Irons noted that the side effects of Colyer's medications made him more susceptible to sunburn, so she gave Colyer lotion to protect him from sunburn. Irons testified that she was unaware of the effect of neuroleptic medication upon the body's ability to regulate temperature.

There is disagreement and a lack of evidence regarding the actual temperature, relative humidity, and heat index on the basketball court at DMHC on June 22, 1993, from 5:45 p.m. to 6:45 p.m. Plaintiff introduced evidence that showed conditions reported by the National Weather Service ("NWS") located at the Dayton Airport approximately eleven miles from DMHC. The conditions reported by NWS are as follows: (1) 4:50 p.m.—temperature 84 degrees and 46% relative humidity; (2) 5:51 p.m.—temperature 83 degrees and 49.2% relative humidity; and (3) 6:50 p.m.—temperature 81 degrees and 54.4% relative humidity.

Colyer played basketball with Wulff and the other patients from approximately 5:45 p.m. to 6:00 p.m., after which the group went inside an air-conditioned building to get a drink of water. The group returned to the basketball court and played a second game that lasted approximately fifteen minutes. Following the second game, the group again went inside for a drink of water. The group returned to the court for a third game. During the third game, in which Colyer only partially participated, he took a break by sitting on a bench located alongside the court. Wulff joined Colyer on the bench and instructed him to put his shirt back on, which Colyer had removed presumably because he was hot. Wulff testified that he also was aware that neuroleptic medication makes a person more susceptible to sunburn. However, he admitted that he, too, was unaware of their effects upon the body's ability to regulate temperature. While sitting on the bench, Colyer became confused and disoriented. He attempted to stand, but collapsed. He began to hyperventilate and lost consciousness. At 6:53 p.m., an emergency medical squad arrived and transported Colyer to the Miami Valley Hospital, where medical personnel pronounced him dead at 7:20 p.m. Upon arrival at the hospital, Colyer's rectal body temperature was 108 degrees. Plaintiff alleges that the proximate cause of Colyer's death was hyperthermia caused by a combination of his medication and exposure to heat and exercise.

Plaintiff claims that defendant was negligent in not recognizing the potential deadly side effects of Colyer's medications, thus allowing him to participate in vigorous exercise while exposed to heat and humidity, which directly caused his death.

In order to prevail on a claim of medical malpractice or professional negligence, plaintiff must first prove that defendant's resident doctors or nurses committed medical malpractice. R.C. 2125.01. The requirements for a meritorious medical malpractice claim under Ohio law are set forth in the case of *Bruni v. Tatsumi* (1976), 46 Ohio St.2d 127, 75 O.O.2d 184, 346 N.E.2d 673:

"In order to establish medical malpractice, it must be shown by a preponderance of the evidence that the injury complained of was caused by the doing of some particular thing or things that a physician or surgeon of ordinary skill, care and diligence would not have done under like or similar conditions or circumstances, or by the failure or omission to do some particular thing or things that such a physician or surgeon would have done under like or similar conditions and circumstances, and that the injury complained of was the direct and proximate result of such doing or failing to do some one or more of such particular things.

"The standard of care for a physician or surgeon in the practice of a board-certified medical or surgical specialty should be that of a reasonable specialist practicing medicine or surgery in that same specialty in the light of present day scientific knowledge in that specialty field; therefore, geographical considerations or circumstances control neither the standard of the specialist's care nor the competence of the testimony of an expert in that specialty." *Id.* at paragraphs one and two of the syllabus.

Proximate cause is established where the negligent act " 'in a natural and continuous sequence produces a result which would not have taken place without the act * * * and the fact that some other act unites with the original act to cause injury does not relieve the initial offender from liability.' One is thus liable for the natural and probable consequences of his negligent acts." *Strother v. Hutchinson* (1981), 67 Ohio St.2d 282, 287, 21 O.O.3d 177, 180, 423 N.E.2d 467, 471, quoting *Clinger v. Duncan* (1957), 166 Ohio St. 216, 222, 2 O.O.2d 31, 34, 141 N.E.2d 156, 162, and citing *Foss–Schneider Brewing Co. v. Ulland* (1918), 97 Ohio St. 210, 119 N.E. 454,

" 'To find that an injury was the natural and probable consequence of an act, it must appear that the injury complained of could have been foreseen or reasonably anticipated from the alleged negligent act.' " *Id.* at 287, 21 O.O.3d at 180, 423 N.E.2d at 471, quoting *Ross v. Nutt* (1964), 177 Ohio St. 113, 114, 29 O.O.2d 313, 203 N.E.2d 118, 120.

Plaintiff offered the expert testimony of Chester W. Schmidt, M.D., who opined that defendant fell below the accepted standard of psychiatric care and treatment of Colyer by allowing him to participate in vigorous exercise given the ambient temperature and humidity. Dr. Schmidt further noted that the medications that were prescribed for Colyer are clinically known to affect the body's ability to regulate temperature. Dr. Schmidt further testified that although the incidence rate of these side effects was not common, physicians and nurses knew or should have known through medical training and literature, including the Physician's Desk Reference, that neuroleptic medications pose potentially fatal side effects. Dr. Schmidt further opined that these risks, combined with even modestly warm temperatures and vigorous activity, would constitute a deviation in the standard of psychiatric care. Plaintiff's toxicology expert, Dr. Dale Sharp, agreed that the three drugs, Thorazine, Prolixin and Cogentin, acting in concert, prevented Colyer's body from dissipating heat and that these side effects are well known.

The Director of Medicine for DMHC, Dr. Oscar Cataldi, admitted personal knowledge that hyperthermia was a known, clinical, side effect of neuroleptic medications. Dr. Cataldi was previously involved with such a case at another mental health center.

Defendant's expert, Dr. Paul Keck, opined that allowing Colyer to engage in vigorous physical activity, given the environmental conditions of June 22, 1993, was not a deviation in the standard of care and that Colyer's hyperthermia was based upon a confluence of risk factors. Keck further opined that hyperthermia is a rare but known side effect of neuroleptic medications and that nurses may not be aware of the possibility of hyperthermia due to the low incidence rate.

Based upon the foregoing expert testimony, plaintiff has established that hyperthermia is a known, clinical side effect of Colyer's neuroleptic medications; that exposure to vigorous exercise, combined with exposure to high levels of heat and humidity, makes a person more susceptible to hyperthermia; and that Colyer died as a result of hyperthermia proximately caused by the neuroleptic medications' effects upon his body while exposed to vigorous exercise and heat. The court finds that Dr. Mauricio was negligent in his failure to annotate physical exercise and heat exposure limitations in Colyer's medical record and that this failure was the proximate cause of Colyer's death. Accordingly, judgment shall be rendered in favor of plaintiff.

*Judgment for plaintiff.*

FRED J. SHOEMAKER, J., retired, of the Franklin County Court of Common Pleas, sitting by assignment.